UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Newark Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 2:21-cr-15 |
| v. | ) | Hon. Stanley R. Chesler |
| MARIA SUE BELL, | ) | |
| Defendant. | ) | |

**EMERGENCY MOTION FOR RECONSIDERATION**

Maria Sue Bell, through counsel, hereby moves for reconsideration of the Court's January 28, 2021, Order denying her Emergency Motion to Revoke the Order of Detention. *See* L. Civ. R. 7.1(i); L. Crim. R. 1.1. In support of this Motion, counsel states:

1. On November 25, 2020, at Ms. Bell's initial appearance, the U.S. Magistrate Judge determined that Ms. Bell was not a flight risk, but found no conditions of release could reasonably assure the safety of the community. ECF No. 1 at 11. The Magistrate's finding was based upon (1) a cache of firearms found in Ms. Bell's residence; (2) her apparent advice to a member of HTS "with respect to the use of weapons"; and (3) her indication in 2018 of a desire to live in Turkey. *Id.* The Magistrate stated that what might have occurred if Ms. Bell's home had been burglarized and the weapons had been taken by a thief was "not [the Court's] concern." *Id.* at 12.

1

2. On December 21, 2020, the Magistrate determined that no conditions of release could reasonably assure the safety of the community because "[i]f somebody broke into [Ms. Bell's] house it would be terror on the streets." *Id.* at 13. The Magistrate determined that Ms. Bell's decision to allow her sons to keep the gun collection they inherited from their father partially unlocked "endangered a community," such that there was no "set of conditions that can assure the safety of the community, whether or not the guns are in the house." *Id.* at 14.

3. Counsel thereafter filed a Motion to Revoke the Order of Detention. On January 22, 2021, the Court held a hearing on the Motion to Revoke. *See* Ex. 1 (transcript of hearing). With regard to the gun collection, the Court stated:

> There is nothing in the record that suggests that [Ms. Bell] had any present intention to utilize this material in any illegal manner. But on the other hand there's nothing in the record which reflects any urgency in removing these weapons from her home, and that is a factor which also enters into the Court's calculation.

*Id.* at 40:22-41:2.

4. At the hearing, counsel stated that Ms. Bell would be willing to consent to more restrictive conditions than were in the defense's proposed bail package, i.e., that Ms. Bell live at her home of 7 years in Hopatcong with her partner Hesham El-Meligy acting as an approved bond co-signer and third-party custodian. *Id.* at 41:15-20. In response, the Court stated: "Mr. Sharma, if you had some reasonable proposals that you thought the Court should consider, that should have been included in your submission to the Court." *Id.* at 41:21-23.

5. At the conclusion of the hearing, the Court determined that no conditions of release could reasonably assure Ms. Bell's appearance in Court. In support of this finding, the Court expressed concern that Ms. Bell "has indicated that she would be perfectly happy to live in Turkey" someday. *Id.* at 42:20-21. The Court further stated:

> And, quite frankly, electronically monitored house arrest is a very imperfect device for limiting the ability of someone to flee if they truly wish to flee. In short: It only takes a knife to cut off the bracelet and run and then to figure out a way to get out of the country and flee to another country.

*Id.* at 42:21-43:1.

6. The Court also determined that no conditions of release could reasonably assure the safety of the community. In support of that finding, the Court stated that it did not consider the weapons in Ms. Bell's home "to be of overwhelming significance." *Id.* at 42:4. Rather, the Court was primarily concerned that Ms. Bell's alleged "activities in support of HTS have revolved around financial support and the use of the internet." *Id.* at 42:4-8. The Court continued:

> [T]he Court, quite frankly, does not know how it could fashion conditions of release which would prevent Ms. Bell from using whatever financial resources she has to support HTS and using the internet-encrypted apps and other internet services to continue her support of a terrorist organization. And nothing has been proposed to me.

*Id.* at 42:9-14.[1]

---

[1] Respectfully, the defense submits that Ms. Bell could not "continue her support of a terrorist organization" because she never provided unlawful support in the first

3

7. On January 28, 2021, the Court issued an Order denying the defense's Motion to Revoke the Order of Detention. *See* ECF No. 6.[2]

8. In drafting the Motion to Revoke, counsel focused on addressing the Magistrate's decision. The Magistrate did not find that Ms. Bell posed a serious risk of flight, and found that Ms. Bell posed a danger solely because of her "act of unreasonableness" allowing her children to store the gun collection they inherited in her basement, partially unlocked. ECF No. 1 at 11, 14. While this Court affirmed the Magistrate's detention order, it did so on different grounds. Unlike the Magistrate, this Court found that Ms. Bell poses a serious risk of flight, and that the gun collection her children stored in the basement was not of "overwhelming

---

place. We continue to maintain that Ms. Bell's actions—financially supporting a man both when he was a member of HTS and when he was not; advising him about what gun he should buy for self-defense, with the express hope that he *not* use the gun to fight; asking to speak to the leader of HTS in order to convey that American journalists are biased against Islam; and telling someone, when he decided to fight the brutal regime of Bashar al-Assad, that she would keep him and HTS in her thoughts—do not constitute unlawful "support of a terrorist organization." As previously stated, in the defense's view, those actions constitute, at most, material support of a man who was incidentally part of HTS, or non-material support of HTS, neither of which is illegal under the material support statute. *See* ECF No. 1 at 25-26. That said, the defense recognizes its position on this issue was already considered by the Court and is therefore not an appropriate basis for a motion to reconsider. *See Drysdale v. Woerth*, 153 F. Supp. 2d 678, 682 (E.D. Pa. 2001).

[2] The Court's Order states, in part, that Ms. Bell's "application for emergency release under 18 U.S.C. section 3142(i) is DENIED." ECF No. 6. However, Ms. Bell has never made an application for release under § 3142(i). Ms. Bell has only requested pretrial release under § 3142(c), *see* ECF No. 1 at 32, which is governed by a different legal standard than temporary release under § 3142(i).

significance" in assessing her danger to the community. Instead, this Court stated that its primary concerns about community safety were preventing Ms. Bell's access to the internet and provision of financial support to HTS.

9. Counsel regrets failing to anticipate the Court's concerns at the January 22, 2021, hearing, and failing to propose a more detailed bail package in advance. In order to prevent a "manifest injustice" here—namely, Ms. Bell's incarceration for an extended period of time while she is presumed innocent—counsel respectfully asks the Court to reconsider its January 28, 2021, Order, and to consider a new proposed bail package. *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

10. The new proposed bail package is as follows:

    a. Ms. Bell will live under home incarceration with location monitoring at her house in Hopatcong, New Jersey.

    b. Ms. Bell's partner, Hesham El-Meligy, will act as third-party custodian.

    c. Ms. Bell will post a $100,000 appearance bond. As collateral, Ms. Bell will post the title for her 2012 Fiat 500, which she owns. She will also post as collateral all of the equity in her home and the deed to the home.

    d. Kyle Magera, Luke Magera, and Mr. El-Meligy will all co-sign the appearance bond. Kyle Magera will post as collateral the title for his 2007 BMW 328xi, which he owns. Luke Magera will post as collateral the title for his

5

2013 Volkswagen Passat, which he owns.   Hesham El-Meligy will post as collateral the title for his 2002 Lexus ES300, which he owns.[3]

  e. By the time of Ms. Bell's release, Mr. El-Meligy will get rid of all internet-capable electronics in the residence except for (1) his work laptop, (2) his personal laptop, (3) his cell phone, and (4) the house's modem.   Those electronics shall only be accessible by passwords that are randomly generated.   The passwords shall not be shared with Ms. Bell.

  f. Ms. Bell shall be permitted to use Mr. El-Meligy's personal laptop only for scheduled videocalls with, or in the physical presence of, undersigned counsel or any agent working at the direction of counsel.   She shall not be permitted to use any other computer or cell phone.

  g. Mr. El-Meligy's personal laptop shall be subject to monitoring by Pretrial Services.

  h. Ms. Bell shall participate in mental health treatment as directed by Pretrial Services.

11. Counsel respectfully submits that the bail package proposed is sufficient to reasonably assure Ms. Bell's appearance in Court and the safety of the community.   *See* 18 U.S.C. § 3142(c)(1)(B).   Ms. Bell is willing to consent to any other conditions that the Court deems necessary under the statute.

---

[3] Neither Luke nor Kyle nor Hesham has any other assets that can be posted as collateral.

12. Following the January 22, 2021, hearing, Ms. Bell's sons, Kyle Magera and Luke Magera, wanted to correct any impression that Ms. Bell had no "urgency in removing the[] weapons from her home"—a factor which the Court stated "enters into [its] calculation." Ex. 1 at 40:22-41:2. Their sworn affidavit, with accompanying evidence, is attached as Exhibit 2.

13. Since the January 22, 2021, hearing, conditions at the Essex County Correctional Facility (ECCF) have only gotten worse. On February 5, 2021, counsel spoke with a client who was sentenced in early December but who has yet to be transferred to BOP custody. Counsel scheduled the legal call after receiving frantic text messages from the client's mother about inhumane conditions at the ECCF. Counsel's client—and scores of other inmates, based on what counsel has heard from other clients and from other criminal defense lawyers—have been locked in their cells for days on end, only allowed out for legal calls, court video appearances, and 15-minute shower breaks every 3 to 4 days. According to counsel's client and at least one colleague's client, the jail cells smell and are filthy. Counsel's client also reported that the food at the facility has been horrendous: he was given nothing but lettuce and two cookies for one meal, and visibly old meat in a sandwich for another. A fellow AFPD visited clients in three different pods at the ECCF on February 8, 2021, and observed that *no inmates wore masks*—neither his own clients nor several he saw passing by in the background. Another defense lawyer heard that there are restrictions on when inmates may wear masks in the

7

ECCF, and that masks are prohibited when inmates walk within certain buildings. A fellow AFPD heard similar complaints about infrequent showering, lockdown, and inhumane food provisions. In short, the ECCF is ***a powder keg***. The bad conditions only provide further reason to believe that Ms. Bell will strictly adhere to conditions of release, particularly as a 53-year-old person with health conditions that likely put her at increased risk of severe illness from COVID-19. *See* § 3142(g)(3).

For the foregoing reasons, Ms. Bell requests immediate reconsideration of the Court January 28, 2021, Order.

Respectfully submitted,

MARIA SUE BELL
By Counsel

<u>/s/ Rahul Sharma, AFPD</u>
Office of the Federal Public Defender
1002 Broad Street
Newark, NJ 07302
(973) 320-7350
Rahul_Sharma@fd.org

8