UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Newark Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cr-15 |
| | ) | |
| MARIA SUE BELL, | ) | Hon. Stanley R. Chesler |
| | ) | |
| Defendant. | ) | |

**SECOND MOTION TO REVOKE ORDER OF DETENTION**

Maria Sue Bell, through counsel, hereby moves to revoke the Magistrate's Order of Detention issued on March 24, 2021.   The transcript of the most recent hearing before the Magistrate is attached as Exhibit 1.

Ms. Bell's months-long detention on a charge of concealing support of a terrorist organization in 2018 is, given her personal history and the stringent conditions of release proposed by the defense, contrary to both the letter and spirit of the Bail Reform Act of 1984 ("BRA").   *See* ECF No. 8, ¶ 10.   There have been many filings and hearings on the issue of bond in this case.   Unfortunately, each has been necessary, due to the shifting reasons for keeping Ms. Bell detained and errors that have prejudiced the defense.   The BRA demands at least a morsel of freedom for Ms. Bell while she is presumed innocent and we prepare this case.

I.   Background

A.   Ms. Bell's arrest

On November 25, 2020, Ms. Bell was arrested for concealing material support

1

to a foreign terrorist organization ("FTO"), Hay'at Tahrir al-Sham ("HTS"), between February 2018 and November 2018.   Because this charge has significantly altered the way that Ms. Bell is perceived, it is essential to briefly take stock of who she was on November 24, 2020, when she was simply a person, not a federal defendant.

On November 24, 2020, Ms. Bell was a 53-year-old who had never been accused of a crime, not even a traffic violation.   She was a woman who, through counseling, overcame the serious trauma of being abandoned by her father, then watching her mother die when she was a teenager.   ECF No. 1 at 30.   She was a mother who raised two terrific adult sons, Kyle Magera and Luke Magera.   She was a former wife who, notwithstanding the difficult marriage she once had with Richard Magera, took care of him when he was diagnosed with terminal brain cancer in 2012.   Ex. 2 (affidavit by Luke and Kyle) ¶ 1.   She was a mentor at William Paterson University to students interested in STEM fields.   Ex. 3 (affidavit by Ms. Bell's partner, Hesham El-Meligy) ¶ 9.   She was a clinical research coordinator at Morristown Medical Center, and had recently celebrated her ninth anniversary there on Facebook.   Case No. 2:20-mj-9451, ECF No. 9 at 2. She was a homeowner excited about solar panels she'd recently had installed, and a new washer/dryer set that allowed her to stay home instead of going to the laundromat.   Ex. 3 ¶ 10.   She was an exasperated mother whose sons did not heed her many requests to remove property they had inherited from their father and kept at her house.   *See generally* Ex. 2.   She was the grandmother to Luke's infant,

2

whom she adores and saw as much as she could within the restrictions of the COVID-19 pandemic.   Ex. 4 (affidavit of Luke Magera) ¶ 14.   She was a devout Muslim active in the New Jersey Libertarian Party.   ECF No. 1 at 24.   She was a partner to Hesham, who works as an Examiner at the New York State Department of Financial Services.   Ex. 3 ¶ 1.   On November 24, the two of them were preparing for a month-long vacation to Egypt and Saudi Arabia.   *Id.* ¶ 4.

Instead of going on vacation with Hesham, then coming back to her home with the new washer/dryer, then going back to work at Morristown Medical Center, then seeing her beloved sons and infant grandson, Ms. Bell has been incarcerated at the Essex County Correctional Facility since November 25, 2020.   To explain how this woman who has never harmed anyone—never *wished* harm upon anyone, never failed to do what she has been told to do—has been incarcerated for nearly *five months* while supposedly presumed innocent, requires summarizing the proceedings in this case so far.

B.   Initial appearance and first motion for bond

At Ms. Bell's initial appearance on November 25, 2020, the Magistrate Judge found that she was not a flight risk, but that, "at this point, without more information," she was a danger to the community, given (1) a cache of firearms found in her residence; (2) her apparent advice to a member of HTS "with respect to the use of weapons"; and (3) her indication in 2018 that she wanted to live in Turkey.   ECF No. 1 at 11.   The Magistrate Judge explicitly stated that what might

3

have occurred if Ms. Bell's home had been burglarized and the firearms stolen was "not my concern."   *Id.* at 12.

A few weeks later, the defense filed a formal motion for bond, attempting to give the Magistrate Judge the information she sought.   The defense presented sworn, detailed affidavits from Kyle and Luke, as well as Hesham, talking about how often Ms. Bell had asked her sons to dispose of the gun and artillery collection they had inherited from their deceased father and kept in her basement.   *See id.* The defense also presented evidence of Ms. Bell's intentions to stay in her home in Hopatcong, NJ, for the foreseeable future, including her relationship with her grandson and the significant debt she had assumed to install solar panels.   *See id.* at 12-13.   The defense proposed that, while Ms. Bell was presumed innocent, she could live in her home with Hesham, who was willing to co-sign an appearance bond and to serve as a third-party custodian.   Case No. 2:20-mj-9451, ECF No. 9 at 3.

At the second bond hearing, the Magistrate Judge determined that, notwithstanding the affidavits from Luke and Kyle and Hesham, Ms. Bell really "didn't want to get rid of the[]" guns in her home.   *Id.* at 13.   The Magistrate Judge further stated that she had "a very large problem when a mother keeps a stash" of guns, and that, as she had "said th[e] last time," "[i]f somebody broke into that house it would be terror on the streets."   *Id.; cf. id.* at 12 (noting the Magistrate Judge's earlier claim that what might have happened in a hypothetical burglary was "not my concern").   The Magistrate Judge determined that Ms. Bell had

4

behaved so unreasonably, by not pressuring her sons more to get rid of the gun collection that they inherited, and by not keeping it in locked safes, that no conditions of release could reasonably assure the safety of the community.   *Id.* at 14.

        C.   <u>Motion to revoke</u>

The defense filed a motion to revoke the Magistrate Judge's decision.   In that motion, the defense argued the Magistrate Judge had committed multiple errors.   *See id.* at 15-19.   The defense also formally argued each of the factors under 18 U.S.C. § 3142(g).   *Id.* at 19-32.   Specifically, the defense argued:   (1) Ms. Bell's charge did not fall into one of the particularly serious categories of offenses enumerated under § 3142(g)(1); (2) the weight of the evidence was weak; (3) Ms. Bell's history and characteristics—if her innocence is presumed—are sterling; and (4) since she had never before intentionally endangered the community, there was no reason to think she would start now.   *Id.*

On January 22, 2021, the Court held a hearing on the first motion to revoke. *See* Ex. 5 (transcript of hearing).   Towards the beginning of that hearing, counsel attempted to note that far more worrisome people than Ms. Bell are routinely granted bond, including people with long criminal records, people who have threatened to kill fellow Americans, and people charged with criminal violations of supervised release.   *Id.* at 4-5.   The Court responded that it "does not help me in making the decision in this case" to hear "what other courts, other prosecutors, and

5

other deciders have done in different cases without being able to go through in detail what those facts are."   *Id.* at 5; *see also id.* at 18 ("[I]'m deciding this case. I'm not deciding what prosecution decisions, what judicial decisions were made by other judges under different facts.").

Later, in response to the defense's argument that Ms. Bell's charge does not constitute a Federal crime of terrorism, or fall into any other category of offense enumerated under § 3142(g)(1), the Court stated:

> Frankly, the Court is not going to dive into that particular rabbit hole, because the Court is ultimately required to consider, overall, the nature of the offense charged and its significance.   In this case, whether or not this offense technically constitutes a federal crime of terrorism, is not controlling.   It is an extremely serious charge.

*Id.* at 34 (paragraph break omitted).   The Court later stated:   "[I]ndeed the nature of the charges and the circumstances indicate that Ms. Bell is fully willing, and to the extent she can be able to support HTS, she wants to do it."   *Id.* at 38.   With regard to sentencing exposure, the Court stated:   "[Q]uite frankly, given the very serious charge here, the potential maximum sentence of 10 years—and I am not going to start parsing what the potential guideline calculation is because the guidelines are only advisory—but Ms. Bell faces a possible 10-year sentence on these charges."   *Id.* at 42.

With respect to § 3142(g)(2), the weight of the evidence, the Court determined that the evidence was "very, very significant" because:

- "Ms. Bell was assisting User 1 [also known as Abdullah] prior to the date

that [HTS] was designated as a terrorist organization with advice about how to buy or obtain a weapon";

- "that advice was extremely detailed and technical and revealed a substantial knowledge about weapons, including cost; whether or not the cost was expensive or not expensive; the availability of weapons; availability of ammunition and so on";

- "the evidence presented in the complaint in the case [shows] that User 1 regarded himself and was an active participant in the terrorist activities of that organization and indeed was a fighter, and indeed Ms. Bell knew that he was a, quote, 'fighter'";

- "[t]he evidence also indicates that, apart from money, which was a specific charge of aiding a foreign terrorist organization, she ha[d] strategic discussions with User 1, indeed advising User 1 to communicate to others, other terrorists that they should not give access to certain journalists because they were not friends and they were hurting the organization";

- the complaint was "replete with references which indicate not only that Ms. Bell had a personal relationship with User 1, but was fully supportive of the objectives that User 1 had in pursuing his activities in HTS and knew that he had rejoined HTS";

- "excerpts in the complaint indicate that Ms. Bell regretted not being able to join User 1 in the fight and felt guilty about it, and felt guilty about not being in Syria, and wanted to get to Turkey to be able to assist";

- "[a]ny doubt about whether or not Ms. Bell was aware of the terrorist activities that User 1 was involved in is dispelled by the chat in which User 1 indicates that if the Aleppo airport was attacked, that it would be revenge or retaliation against New York";

- Ms. Bell had certain "conversations and communications" on WhatsApp, which "one in the position of a supporter of HTS would want to keep hidden from law enforcement officers and agents"; and

- Ms. Bell used an intermediary to send funds to Abdullah, which, "in the context of trying to aid a foreign terrorist organization and provide aid to one who is a member of it for his use, . . . is indeed significant because it shows that one wants to hide the transfer of the funds."

*Id.* at 35-37.   Based on all of this, the Court found "the weight of the evidence in this case is indeed substantial."   *Id.* at 38.

With regard to § 3142(g)(3), Ms. Bell's history and characteristics, the Court stated that:

- Ms. Bell "has never been charged with any criminal offense whatsoever";

- Ms. Bell is "a lifelong resident of the United States," and "a citizen of the United States";

- Ms. Bell "has strong ties to the community";

- "the complaint itself sets forth a history of concealed past conduct, however, and evidence of that past conduct which is substantial";

- there was "a substantial number of weapons . . . found in her home," which "presents the Court with a good deal of concern," as "all at least present some degree of danger";

- while there was "nothing in the record that suggests that [Ms. Bell] had any present intention to utilize [the weapons] in any illegal manner, . . . there's nothing in the record which reflects any urgency in removing these weapons from her home";

- "the record is clear that based upon a number of chats Ms. Bell would have no hesitancy in moving to Turkey if she could, and expressed that desire on a number of occasions."

*Id.* at 38-41.

During the hearing, counsel stated that Ms. Bell would be willing to consent to more restrictive conditions than were in the defense's proposed bail package, i.e., that Ms. Bell live in her home of 7 years in Hopatcong with her partner Hesham as approved bond co-signer and third-party custodian.   *Id.* at 41.   In response, the

Court stated:   "Mr. Sharma, if you had some reasonable proposals that you thought the Court should consider, that should have been included in your submission to the Court."   *Id.*

At the conclusion of the hearing, the Court determined that no conditions of release could reasonably assure Ms. Bell's appearance in Court to answer the charge against her.   In support of this finding, the Court again expressed concern that Ms. Bell "has indicated that she would be perfectly happy to live in Turkey." *Id.* at 42.   The Court further stated:

> And, quite frankly, electronically monitored house arrest is a very imperfect device for limiting the ability of someone to flee if they truly wish to flee.   In short:   It only takes a knife to cut off the bracelet and run and then to figure out a way to get out of the country and flee to another country.

*Id.*

The Court also determined that no conditions of release could reasonably assure the safety of the community.   In support of that finding, the Court stated that it did not consider the weapons in Ms. Bell's home "to be of overwhelming significance."   *Id.*   Rather, the Court was primarily concerned that Ms. Bell's alleged "activities in support of HTS have revolved around financial support and the use of the internet."   *Id.*   The Court continued:

> [T]he Court, quite frankly, does not know how it could fashion conditions of release which would prevent Ms. Bell from using whatever financial resources she has to support HTS and using the internet-encrypted apps and other internet services to continue her support of a terrorist organization.   And nothing has been proposed to

9

me.

*Id.*

On January 28, 2021, the Court issued an Order denying the defense's first motion to revoke.   ECF No. 6.[1]

D.   Motion for reconsideration

On February 11, 2021, the defense filed a motion for reconsideration.   ECF No. 8.   In that motion, the defense explained that the reason it failed to present a more robust bail package previously was that the Magistrate Judge had not found Ms. Bell to be a flight risk, and had only found Ms. Bell to be a danger to the community based upon the guns in her basement, not based on internet risks.   *Id.* ¶ 8.   In response to the Court's most recent determination that Ms. Bell *does* present a risk of flight and that the danger she poses primarily relates to her ability to support HTS through the internet, the defense presented a bail package replete with severe restrictions on Ms. Bell's movement and internet access, as well as sacrifices by her adult sons and her partner that would lead to the financial ruin of each if Ms. Bell were to flee.   *See id.* ¶ 10.   The motion for reconsideration also presented yet another affidavit by Ms. Bell's sons, along with supporting text

---

[1] The Court's January 28 Order states, in part, that Ms. Bell's "application for emergency release under 18 U.S.C. section 3142(i) is DENIED."   ECF No. 6. However, Ms. Bell has never made an application for release under § 3142(i).   Ms. Bell requested pretrial release under § 3142(c), *see* ECF No. 1 at 32, which is governed by a different legal standard than temporary release under § 3142(i).

messages, to show conclusively that Ms. Bell really tried to get her sons to remove the property they had inherited from their father, including his gun collection, from her basement.   *See* Ex. 2.

On March 1, 2021, the Court denied the motion to reconsider, finding the presentation of a new bail package was "not an appropriate basis for th[e] extraordinary remedy" of reconsideration.   ECF No. 11 at 3.   The Court concluded its Order denying the motion to reconsider with the statement:   "Should she wish the Court to consider a renewed motion for pretrial release, Defendant may file the appropriate motion with the magistrate judge."   *Id.* at 4.

E.    Second motion for bond

On March 3, 2021, the defense filed a letter motion for bond with the Magistrate Judge, asking her to evaluate the sufficiency of the bail package proposed in paragraph 10 of the motion for reconsideration.   Case No. 2:20-mj-9451, ECF No. 18.   The same day, the Magistrate Judge announced that she would "hold a telephonic status conference on 3/5/21 at 12 p.m."   *Id.*, ECF No. 19.

The status conference was not recorded, and Ms. Bell was not present.   By counsel's recollection, the status conference began with the Magistrate Judge stating that she doubted she could consider the letter motion for bond, in light of this Court's earlier denial of the motion for reconsideration.   The Magistrate Judge repeatedly questioned counsel about her authority to consider the letter motion, and inquired into which portions of this Court's January 22 decision she was bound by.

11

The prosecutor argued that the Magistrate Judge had no authority to consider the letter motion, and that all relevant issues had already been decided.   Per counsel's records, the status conference lasted over 30 minutes.

Ten days later, on March 15, 2021, the defense filed a letter asking that a bond hearing be scheduled as soon as possible, and submitting that further delay was unnecessary and unfair to Ms. Bell.   *Id.*, ECF No. 21.

On March 23, 2021, the defense filed a letter with the Court noting that an alleged Oath Keeper named Thomas E. Caldwell—who was indicted for leading the right-wing uprising against the Capitol on January 6, 2021; who is being considered for sedition charges; who referred to liberals as "maggots" and "pure evil" whom "[w]e must smite"; who said that "we will have to get violent" in order to achieve political goals; who talked about how he carried his own "gear" and liked to "go where the enemy is"; who bragged about "breach[ing]" government security protecting members of Congress—had been released on bond, while Ms. Bell remains incarcerated.   *Id.*, ECF No. 23.

F.   The most recent bond hearing

On March 24, 2021, a video bond hearing was held before the Magistrate Judge.   Ex. 1.   The Magistrate Judge began by stating that "[t]errorism is included" as a "crime of violence" under 18 U.S.C. § 3142(g)(1).   *Id.* at 4.   Counsel responded that Ms. Bell's material support charge is not a crime of violence.   *Id.* at 5-6.

12

In response to the defense's March 23, 2021, filing about Thomas E. Caldwell, the Magistrate Judge indicated she would not consider that case based upon this Court's statement that "[t]elling me what other courts, other prosecutors, other deciders have done in different cases without being able to go through in detail what those facts are, does not help me in making a decision in this case."   *Id.* at 9-10.

Later, the Magistrate Judge returned to the subject of the gun collection in Ms. Bell's basement, the sole basis of the Magistrate Judge's previous detention order.   The Magistrate Judge stated that Ms. Bell's "proclaimed innocence of control over these weapons in her home is defied by a March 8th, 2017, [message from] Ms. Bell to User 1" about what kind of gun he might like to buy.   *Id.* at 18.

The Magistrate Judge stated that she had given defense counsel "the benefit of airing out your arguments, as I have twice before," and that she "could deny this on procedural grounds, because I agree there is no new material that affects my prior decision of danger to the community, codified by Judge Chesler."   *Id.* at 23. The Magistrate Judge reiterated that she found Ms. Bell "was not a flight risk, necessarily, but I was disturbed by the danger to the community aspect."   *Id.*

The Magistrate Judge then quoted at length from the transcript of the hearing before this Court on January 22, and concluded:   "She will be detained pending disposition of the case, I affirm.   And it's not an 'affirm'; it's I agree with Judge Chesler's findings."   *Id.* at 24.

II.   Legal Standard

Under the Bail Reform Act of 1984, pretrial detention is only appropriate when a Judge finds (1) by a preponderance of the evidence, that no conditions of pretrial release can reasonably assure the appearance of the defendant at trial; or (2) by clear and convincing evidence, that no conditions of pretrial release can reasonably assure the safety of the community while the case is pending.   18 U.S.C. § 3142(e)(1); *United States v. Himler*, 797 F.2d 156, 160-61 (3d Cir. 1986). In determining whether conditions of release can reasonably assure the appearance of a defendant and the safety of the community while a case is pending, the Court must consider (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger that would be posed by the person's release.   § 3142(g).

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."   *United States v. Salerno*, 481 U.S. 739, 755 (1987).   Because courts can "set whatever restrictions on release are necessary" to reasonably assure the appearance of a defendant and the safety of the community, "bail should be denied under the Bail Reform Act *only as a matter of last resort*." *Gov't of Virgin Islands v. Leycock*, 678 F.2d 467, 469 (3d Cir. 1982) (emphasis added).   "The structure of the [BRA] mandates every form of release should be considered before detention may be imposed."   *United States v. Orta*, 760 F.2d 887,

14

892 (8th Cir. 1985).   The BRA only requires "conditions that will 'reasonably' assure appearance [and safety], not guarantee [them]."   *United States v. Xulam*, 84 F.3d 441, 444 (D.C. Cir. 1996) (per curiam); *accord Orta*, 760 F.2d at 891-92.

"A court reviewing a detention order under § 3145(b) must make a *de novo* assessment of whether bail is warranted."   *United States v. Harry*, 2020 WL 1933990, at *2 (D.N.J. Apr. 22, 2020); *see also United States v. Perry*, 788 F.2d 100, 107 (3d Cir. 1986) (noting that § 3145(b) "authorizes the district court to hold a *de novo* hearing").   The District Court is thus "unfettered" in its assessment, and "not constrained to look for abuse of discretion or to defer to the judgment of the prior judicial officer."   *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985). While "[i]n most cases the district court will find it useful to consider carefully the decision and reasoning of the magistrate," the court need not "specifically detail[] which portions," if any, "of the magistrate's reasoning were incorrect."   *Id.* at 1395. "It is sufficient that the district court fully explain[] the result it reached and the reasons for it."   *Id.*

III.   <u>Argument</u>

    A.   <u>The Magistrate Judge's decision should receive no deference.</u>

Because, in most cases, this Court will "find it useful to consider carefully the decision and reasoning of the magistrate," *id.*, counsel must begin there.

In addressing the defense's first formal motion for bond, the Magistrate Judge assumed—despite sworn, detailed statements from Ms. Bell's sons and

partner to the contrary—that Ms. Bell secretly wanted to keep her sons' gun collection, which they inherited from their father, in her home.   The Magistrate Judge also maintained that at the first hearing on the issue of bond, she had told counsel her primary concern was what might have happened to the unlocked gun collection if Ms. Bell's home had been burglarized.   (In fact, as already noted, the Magistrate had said the opposite, that this was "not my concern.")   The Magistrate Judge also expressed concern that Ms. Bell was "a mother" who had guns in her home.   Moreover, the Magistrate Judge did not inquire at all about what Congress and the New Jersey State Legislature require in terms of gun storage, *i.e.*, not much, and instead imposed her views on what is an acceptable number of guns to have and how they should be stored.   Finally, the Magistrate Judge decided that because she believed Ms. Bell had behaved unreasonably, Ms. Bell—the 53 year old with no criminal record whose highlights of 2020 were the birth of her grandson and the installation of solar panels on her roof—was an incorrigible danger to the community and that no conditions of release could reasonably assure its safety.

The Magistrate Judge's consideration of the most recent motion was also deeply flawed.   It began with a lengthy, unrecorded "status conference."   Weeks later, the Magistrate Judge held a bond hearing.   The hearing began with the Magistrate Judge's incorrect claim that Ms. Bell's charge is a "crime of violence" under § 3142(g)(1).   Eventually, the Magistrate Judge once again focused on the gun collection in Ms. Bell's basement and stated that she could not "proclaim[]

16

innocence of control over these weapons in her home" because of a text exchange with User 1 in March 2017.   Never mind the absence of literally any connection between the text exchange in March 2017 and the gun collection that Ms. Bell's children stored in her home months later, in September 2017.   Ex. 4 ¶ 9.   Never mind that Ms. Bell is not charged for the text exchange, which occurred almost a year before February 2018.   Never mind the detailed sworn statements and accompanying evidence from Luke and Kyle Magera that Ms. Bell asked them to move out their father's property.   Ex. 2.   Never mind the fact that this Court already found that "nothing in the record . . . suggests that [Ms. Bell] had any present intention to utilize [the weapons] in any illegal manner."   Ex. 5 at 40.

The multiple errors throughout this case are reason enough to give no deference to the Magistrate Judge's bond determination.   Assuming *arguendo* they are not, another reason to give no deference is that the Magistrate Judge relied heavily on this Court's decision on January 22, 2021, *see* Ex. 1 at 23-24, which, as explained below, contained several errors that prejudiced the defense.

B.   The Court must decide whether the instant charge is a Federal crime of terrorism—which it absolutely is not.

At the hearing on January 22, 2021, the Court found that § 3142(g)(1) supported a finding that no conditions of release could reasonably assure Ms. Bell's appearance in Court or the safety of the community.   In reaching this conclusion, the Court sidestepped the issue of whether the charge against Ms. Bell is a Federal

crime of terrorism, calling it a "rabbit hole" and saying that, regardless of the answer, 18 U.S.C. § 2339C "is an extremely serious charge."   Ex. 5 at 34.   While that is true, the Court is still required to determine whether Ms. Bell is charged with a Federal crime of terrorism.   Because she is not, § 3142(g)(1) does not support a conclusion that no conditions of release can reasonably assure Ms. Bell's appearance in Court or the safety of the community.

The plain text of the BRA specifically requires the Court to determine whether Ms. Bell's charge is a Federal crime of terrorism.   *See* § 3142(g)(1); *United States v. Chrestman*, ___ F. Supp. 3d ___, 2021 WL 765662, at *8 (D.D.C. Feb. 26, 2021); *United States v. Baker*, 349 F. Supp. 3d 1113, 1134 (D.N.M. 2018).   While § 3142(g)(1) asks the Court to consider the nature and circumstances of the charge "as a general matter," it "points especially to instances where the offense is a crime of violence, . . . a Federal crime of terrorism," or a similarly serious offense.   *United States v. Addison*, 217 F. Supp. 3d 69, 75 (D.D.C. 2016).   That is because Congress "thought it was especially significant if the charges include . . . a Federal crime of terrorism."   *United States v. Stone*, 608 F.3d 939, 947-48 (6th Cir. 2010).

Why is it especially significant?   Not just because Congress has said so, but because once a charge is designated as a Federal crime of terrorism—that is, once a court finds that alleged actions not only constituted material support of an FTO but were specifically "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"—the U.S.

18

Sentencing Guidelines recommend a vastly higher sentence.   18 U.S.C. §

2332b(g)(5) (defining "Federal crime of terrorism"); U.S.S.G. § 3A1.4 (adding 12

offense level points and placing the defendant in criminal history category VI if an

offense of conviction constitutes a Federal crime of terrorism).[2]   Courts have

recognized that defendants facing severe penalties have a greater incentive to flee.

*See, e.g.*, *United States v. Madoff*, 316 Fed. Appx. 58, 59 (2d Cir. 2009); *United*

*States v. Ho*, 2016 WL 5875005, at *4 (E.D. Tenn. Oct. 7, 2016).   Thus, while

Congress saw fit to make § 2339C a "presumption" charge under § 3142(e)—

requiring the defendant to present evidence to rebut a presumption of flight or

danger to the community—it did not allow courts to find that every such charge

strongly supports detention under § 3142(g)(1).   Instead, it specifically singled out

"Federal crimes of terrorism" for special consideration under § 3142(g)(1), and has

instructed courts to determine if a § 2339C charge falls into that category.

　　　None of this is to say that the Court was wrong when it called Ms. Bell's

charge "extremely serious."   Any reasonable person would agree that a charge

carrying a maximum sentence of ten years in prison which tars the defendant as a

terrorist sympathizer is extremely serious.   But lots of federal crimes carry

---

[2] The defense understands that the Guidelines are merely advisory, but it is
extremely rare that courts, in this District at least, give a sentence above the
Guidelines' recommendation.   Moreover, the Guidelines calculation is the first step
in determining what sentence to give a defendant who has been convicted, *United*
*States v. Fumo*, 655 F.3d 288, 308 (3d Cir. 2011), and is thus essential in evaluating
sentencing exposure.

statutory maximum sentences of ten years or more—bank fraud carries 30 years; wire fraud, 20; simple distribution of a small quantity of cocaine, 20—and lots of them involve shameful allegations of disregarding the law and the safety of the community.   Courts routinely release people charged with those offenses, however, because people are supposed to be presumed innocent, § 3142(j), and because facing a statutory maximum sentence of 30 years in prison and an accusation of chicanery do not necessarily mean that there are no conditions of release that can reasonably assure appearance and community safety.   Indeed, even § 924(c) defendants, who face a statutory maximum of life in prison and are accused of possessing firearms in furtherance of *other* illegal activity, are not infrequently granted release on bond, despite the fact that § 924(c) is both a presumption offense under § 3142(e) *and* a particularly serious offense under § 3142(g)(1).

In this case, there is no allegation, much less evidence that Ms. Bell intended to influence through intimidation or coercion, or to retaliate against, the regime of Bashar Al-Assad by allegedly providing support to HTS in 2018.   Thus, the instant charge is not a Federal crime of terrorism, and the defense expects that even if Ms. Bell were convicted of § 2339C(c)(2)(A) after trial, her recommended sentence under the U.S. Sentencing Guidelines would be well under 10 years.   Accordingly, § 3142(g)(1) does not support a finding that no conditions of release can reasonably assure Ms. Bell's appearance or the safety of the community.

C.      Contrary to this Court's finding, the nature and circumstances of this
        case do not support the existence of any present criminal intent.

At the hearing on January 22, 2021, the Court stated:   "[I]ndeed the nature

of the charges and the circumstances indicate that Ms. Bell *is* fully willing, and to

the extent she *can be able to support HTS, she wants to do it*."   *Id.* at 38 (emphases

added).   Later, the Court relied on this factual finding to deny bond:

> [T]he Court, quite frankly, does not know how it could fashion
> conditions of release which would prevent Ms. Bell from using
> whatever financial resources she has to support HTS and using the
> internet-encrypted apps and other internet services *to continue her
> support of a terrorist organization*.   And nothing has been proposed to
> me.

*Id.* at 42 (emphasis added).   At the most recent bond hearing, the Magistrate

Judge quoted this passage immediately before denying bond yet again.   Ex. 1

at 24.

The Court's findings that Ms. Bell currently "is fully willing . . . to support

HTS" and "wants to" "continue her support" of the organization were in error.   Ms.

Bell is not alleged to have provided material support to HTS since November 2018.

Indeed, the Complaint does not allege *any* illegal activity by Ms. Bell in 2019 or

2020.   Nearly five months after Ms. Bell's arrest, through multiple bond hearings

and submissions, the defense has not heard any accusation from the government

that Ms. Bell continued engaging in illegal activity after November 2018.   Thus,

there is absolutely no basis to conclude that Ms. Bell currently "wants to" "continue

her support" of HTS.   *Cf. United States v. Thomas*, 2006 WL 140558, at *6 (D. Md.

Jan. 13, 2006) (finding it was a mitigating factor under § 3142(g)(1) that the defendant's alleged offense "occurred approximately three years ago"); *United States v. Tyerman*, 2011 WL 13199122, at *3 (S.D. Iowa Aug. 26, 2011) (same); *United States v. Conn*, 2016 WL 8488238, at *6 (E.D. Ky. Apr. 12, 2016) (similar; offenses allegedly occurred "four or more years ago"); *United States v. Geer*, 2009 WL 3669642, at *2 (S.D.W. Va. Nov. 3, 2009) ("The Government's argument that Defendant poses a present risk to others is mitigated somewhat by the fact that the alleged offense occurred four years ago.").

Because the Court was mistaken in concluding that the evidence shows Ms. Bell "wants to" "continue her support" of HTS, and because that conclusion influenced the Court's determination under § 3142(g)(1), the Court should revisit it. In the defense's view, § 3142(g)(1) does not strongly support Ms. Bell's detention while she is presumed innocent, given that (1) Ms. Bell's alleged misconduct occurred more than two years ago; (2) she is not alleged to have broken the law at all since; (3) there is evidence that Ms. Bell sent money to Abdullah even when he was not part of HTS; and (4) Ms. Bell has never wished harm on *anyone*, much less anyone in Syria or the United States.   ECF No. 1 at 22-24.

D.   <u>The chance of acquittal in this case is significantly greater than in other federal criminal cases.</u>

At the hearing on January 22, 2021, the Court found that § 3142(g)(2) supported a finding that no conditions of release could reasonably assure Ms. Bell's

22

appearance in Court or the safety of the community.   *See* Ex. 5 at 35.   As

recounted in more detail earlier, the Court reached this finding because, in 2017

and 2018:

- Ms. Bell assisted User 1 in buying a weapon;

- Ms. Bell knew User 1 was part of HTS and "an active participant in the terrorist activities of that organization and indeed was a fighter";

- Ms. Bell told User 1 that HTS members should not speak with American journalists because they are often biased against Islam and organizations like HTS;

- Ms. Bell expressed support for HTS soldiers;

- Ms. Bell must have known Abdullah and HTS were engaged in terrorist activity from his text that if American forces attacked an airport in Aleppo, HTS would seek revenge in New York; and

- Ms. Bell clearly used encrypted applications like WhatsApp and an intermediary to send money to Abdullah because it was "in the context of trying to aid a foreign terrorist organization."

Ex. 5 at 35-37.   In denying bond most recently, the Magistrate highlighted that

"Judge Chesler found no ambiguity and was satisfied that the weight of the

evidence is, indeed, substantial."   Ex. 1 at 23.

Assuming, for the sake of argument, that the defense agrees with the Court's

factual findings in its § 3142(g)(2) analysis, there is still a far higher chance of

acquittal in this case than in most federal criminal cases.   Meaning that there is

far less likelihood that Ms. Bell will flee to escape trial and far more chance that she

will be wrongly incarcerated.   *See United States v. Lizardi-Maldonado*, 275 F.

Supp. 3d 1284, 1292 (D. Utah 2017) ("Th[e] traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction."); *United States v. Kent*, 2020 WL 7353049, at *4 (D.D.C. Oct. 26, 2020) ("[J]udges should be hypersensitive to detaining a defendant against whom the evidence of guilt is weak, as that person may otherwise never spend time in confinement.").

As an initial matter, certain actions, like Ms. Bell's alleged assistance to Abdullah with purchasing a weapon, occurred well before the period of time—February 2018 to November 2018—that Ms. Bell is charged for.   While the Court may be troubled by Ms. Bell's alleged assistance to Abdullah in early 2017—and may not credit her contemporaneous statements that she only wanted the weapon to be used for self-defense—that assistance does not support the instant charge at all and should not be part of the Court's § 3142(g)(2) analysis.   At most, Ms. Bell's assistance with the weapon purchase supports a finding that she made poor decisions in March 2017; it does not support a finding that she is guilty of a federal charge.   *See Chrestman*, 2021 WL 765662, at *8 (noting that the "charged conduct" is the focus under §§ 3142(g)(1) and (g)(2)); *cf. United States v. Gumbs*, 283 F.3d 128, 132 n.3 (3d Cir. 2002) ("The *actus reus* element of a crime is the 'wrongful deed that comprises the physical components of a crime and that generally must be coupled with *mens rea* to establish criminal liability.").

As for the other actions, the defense continues to maintain that Ms. Bell's

actions—financially supporting a man both when he was a member of HTS and when he was not; asking to speak to the leader of HTS in order to convey that American journalists are biased; and telling someone, when he decided to fight the brutal regime of Bashar al-Assad, that she would keep him and HTS in her heart— do not constitute material support of a terrorist organization.   Those actions constitute, at most, material support of a man who was incidentally part of HTS, or non-sophisticated (and therefore non-material) support of HTS, *neither* of which is illegal under the material support statute.   *See* ECF No. 1 at 25-26 (discussing various cases interpreting the statute).

Of course, the defense acknowledges that a jury might disagree.   We do not believe a trial is unnecessary in this case, or that the government's charge must be dismissed.   Twelve jurors *might* conclude that even though Ms. Bell never encouraged Abdullah to rejoin HTS, and even though she sent him money when he was not part of HTS, and even though she did not increase the amount of money she sent to him (or offer any other sort of reward) once he rejoined, she knew that the money she was sending was helping to support HTS.   The defense considers this possibility extremely unlikely, but admits it exists.   But we also do not believe § 3142(g)(2) supports a determination that Ms. Bell's goose is cooked.   "[T]he evidence presented to date suggests that [Ms. Bell's] conviction is not certain, thus diminishing any incentive [s]he might have to flee."   *United States v. Simone*, 317 F. Supp. 2d 38, 48 (D. Mass. 2004); *see also Lizardi-Maldonado*, 275 F. Supp. 3d at

1292 ("[T]o avoid falling down the rabbit-hole into the world of '[s]entence first—

verdict afterwards,' the Court considers the strength of the evidence in terms of that

evidence's bearing on the risk of nonappearance and the risk of harm to the

community.").[3]

      E.    <u>Ms. Bell's history and characteristics deserve to be reevaluated.</u>

      At the hearing on January 22, 2021, in analyzing § 3142(g)(3), the Court

stated that "there's nothing in the record which reflects any urgency in removing

the[] weapons [her children inherited] from her home."   Ex. 5 at 40-41.   Ms. Bell's

sons asked counsel to submit a more detailed affidavit, with exhibits, about her

efforts to do just that.   The affidavit is submitted as Exhibit 2.   We ask the Court

to consider it.

---

[3] In the alternative, should the Court disagree and find that Ms. Bell's eventual conviction is certain, the Court should note that, because of the sacred presumption of innocence, and because juries often surprise judges, many courts consider weight of the evidence to be "the least important of the various factors" under § 3142(g). *United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008).   For similar reasons, courts have held that weight of the evidence under § 3142(g)(2) only refers to the weight of the evidence that a defendant is likely to flee or present a danger to the community, not weight of the evidence of guilt.   *Stone*, 608 F.3d at 948; *see also United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (stating that § 3142(g) "neither requires nor permits a pretrial determination of guilt"); *United States v. Taylor*, 289 F. Supp. 3d 55, 66 (D.D.C. 2018) ("[T]he Court recognizes that the Bail Reform Act does not purport to—nor could it, consistent with due process— authorize pretrial detention based simply on a preliminary assessment of the defendant's guilt. . . .   Even overwhelming evidence of guilt would not, alone, meet" the government's burden to "convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person.").

The Court also stated:   "[T]he record is clear that based upon a number of chats Ms. Bell would have no hesitancy in moving to Turkey if she could, and expressed that desire on a number of occasions."   Ex. 5 at 41.   First, the phrase "if she could" is the operative phrase in the Court's assessment.   Hesham has made clear that Maria, given her finances and lack of language skills, most definitely could not move to Turkey within the foreseeable future.   Ex. 3 ¶ 6.   Moreover, as with Ms. Bell's alleged support of HTS, Ms. Bell desired to move away from the U.S. to Turkey over two years ago, and that is not Ms. Bell's current intention at all. For one thing, Ms. Bell did not have an infant grandson at the time of her chats with Abdullah in 2018.   For another, she was not dating Hesham and had not fallen in love with him yet.   Nor had she spoken with Hesham about how difficult it would be to live in Turkey as someone with limited finances who does not know the language and has lived in New Jersey her entire adult life.

Finally, the defense asks the Court to consider the context of Ms. Bell's statements about feeling anxious in the U.S. in 2017 and 2018.   Those were the first years of a presidential administration led by a man who published a "Statement on Preventing Muslim Immigration" that called for a "total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on."   *See generally Trump v. Hawaii*, 138 S. Ct. 2392, 2435-38 (June 26, 2018) (Sotomayor, J., dissenting).   A man who said that "Islam hates us. . . .   [W]e can't allow people coming into this country who

have this hatred of the United States . . . [a]nd of people that are not Muslim."   A man who called for surveillance of mosques in the United States, blaming terrorist attacks on Muslims' lack of "assimilation" and their commitment to "sharia law."   A man who, one week after taking office, signed an Executive Order titled "Protecting the Nation from Foreign Terrorist Entry Into the United States"—and, while signing it, said about the title, "We all know what that means."   A man who said that Christians would be given priority for entry as refugees into the United States. A man who, according to a Presidential adviser, asked for "the right way to do [a 'Muslim ban'] legally."   A man who openly *celebrated* a massacre of Muslims in the Philippines as a way of stopping terrorism.

Given the extreme Islamophobia that Ms. Bell and other Muslims experienced in 2017 and 2018—not to mention the fact that Ms. Bell's grandson had not been born, and she had not begun dating Hesham—the defense does not believe it is fair to assume Ms. Bell's wishes in 2018 to go live in Turkey are her feelings today.   Even more strongly, the defense does not believe such an assumption is a valid basis to deny Ms. Bell bond, particularly given all the positive characteristics she possesses and the stringent conditions of release we have proposed.

Over the course of the bond hearings, the Magistrate Judge and this Court have repeatedly recited the Complaint's litany of inflammatory communications in 2017 and 2018 about Ms. Bell keeping HTS in her heart and being in contact with "revolutionaries"—which, again, the defense does not believe prove provision of

28

*material support* to HTS.   *See* ECF No. 1 at 25-26.   Meanwhile, there has been little to no reference to Ms. Bell's long tenure as a clinical research coordinator at a hospital; her noble history of taking care of her dying mother when she was a teenager, and later her terminally ill ex-husband; the fact that she raised two outstanding sons; her service as a volunteer mentor to STEM students at William Paterson University; her recent major improvements to her home in Hopatcong, which indicate her intention to stay there for the foreseeable future; or her relationship with her beloved infant grandson.   Nor did the Magistrate Judge mention that Ms. Bell's sons and partner have placed literally everything they own, in addition to a $100,000 unsecured bond, on the line as secured collateral because they are certain she will not flee.   *See* ECF No. 8, ¶ 10.

The Court has also failed to note that the government investigated Ms. Bell for at least months, if not years, before her arrest and almost certainly could have gotten its warrant much sooner if it considered her to be a current danger to the community—to currently be providing material support to HTS, or committing some other crime.   But it chose not to.   Notably, at the first bond hearing in this case, the government's danger argument relied almost entirely on the weapons found in Ms. Bell's basement.   ECF No. 1 at 43-44.   As Ms. Bell's sons and partner have attested in detail, however, those firearms were part of the sons' inheritance from their father, Richard, and Ms. Bell repeatedly asked Kyle and Luke to stop storing them in her basement.   *See* Ex. 2.   Moreover, as the Court has found, there

is "nothing in the record that suggests that [Ms. Bell] had any present intention to utilize [the weapons] in any illegal manner."   Ex. 5 at 40.   Given the absence of any indication of illegality relating to the gun collection, and given the obvious attempts Ms. Bell made to get her sons to clear out the basement, and given the length of the government's investigation before arresting Ms. Bell—when it surely could have gotten a warrant sooner—any argument from the government that it believes no conditions of release can reasonably assure the safety of the community while she is presumed innocent should be viewed with great skepticism.

      F.     <u>The Court should consider cases with comparable, or even far more considerable, flight and danger concerns in which courts have ordered release.</u>

At the hearing on January 22, 2021, the Court rejected defense counsel's attempt to discuss far more concerning cases in which accused persons received bond under the BRA, stating that "what other courts, other prosecutors, and other deciders have done in different cases without being able to go through in detail what those facts are does not help me in making the decision in this case."   Ex. 5 at 5; *id.* at 18.   At the most recent bond hearing, the Magistrate Judge quoted this passage to preclude the defense's argument about how bond had recently been granted to Thomas E. Caldwell, who is alleged to have organized the right-wing uprising at the Capitol on January 6, 2021.   Ex. 1 at 9-10.

The Court erred in declining to entertain a discussion of other cases applying the BRA.   The Court was in fact required to consider them, since a basic tenet of

due process is consistent application of the law.   *See Jankowski-Burczyk v. I.N.S.*, 291 F.3d 172, 176 (2d Cir. 2002) ("The Due Process Clause of the Fifth Amendment guarantees every person the equal protection of the laws, 'which is essentially a direction that all persons similarly situated should be treated alike.'") (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)).   Indeed, there are countless decisions in which courts, including the Third Circuit, have discussed the application of the BRA to other fact patterns.   *See, e.g.*, *United States v. Himler*, 797 F.2d 156, 162 (3d Cir. 1986); *United States v. Mattis*, 963 F.3d 285, 295-96 (2d Cir. 2020); *Hir*, 517 F.3d at 1091; *United States v. Paulino*, 335 F. Supp. 3d 600, 610-11 (S.D.N.Y. 2018); *United States v. Hassanshahi*, 989 F. Supp. 2d 110, 114 (D.D.C. 2013).

Once the Court does consider how the BRA has been applied in other cases— once it considers all the defendants far more worrisome than Ms. Bell who have received bond on *less* stringent conditions than those proposed by the defense in this case—it becomes even more clear that she deserves a sliver of freedom while she is presumed innocent.   The Court's stated concern that Ms. Bell may cut off her bracelet and flee to Turkey—without her passport, without any assets, without having been to that country in years, without knowing the language, and without any known contacts there who would board her—is highly speculative.   *See United States v. Sanders*, 466 F. Supp. 3d 779, 785 (E.D. Mich. 2020) ("As to flight, there is little evidence that [the defendant] poses any risk.   As defense counsel put it, [the

defendant] has no passport and no money.   His family, community, and professional ties are in this district, with the notable exception of his . . . proposed third-party custodian . . . .").   Moreover, that speculative risk is strongly mitigated by the defense's proposed bail package, which would financially ruin Ms. Bell's beloved sons and partner if she fled.

*Himler* is just one of many cases that supports bond here.   In that case, the defendant was charged with a multiple instances of fraud, and the Third Circuit acknowledged that he was "*clearly capable of obtaining false identification.*"   797 F.2d at 162 (emphasis added).   Still, the Court granted bond because there was "no direct evidence to suggest that he would flee from prosecution in the future," and because "[m]ere opportunity for flight is not sufficient grounds for pretrial detention."   *Id.* (comparing cases).

*United States v. Hitselberger*, 909 F. Supp. 2d 4 (D.D.C. 2012), also supports release on conditions.   In that case, the court granted bond to a defendant charged with unlawful removal and retention of sensitive *national defense materials*.   The court "acknowledge[d] that [the defendant] presents some risk of flight," noting his "considerable language skills and a demonstrated ability to live abroad."   *Id.* at 9. Still, the court found that, despite the nature of the charge, despite the defendant's language skills, and despite his demonstrated ability to live abroad, there were conditions of release that "could reasonably assure his appearance for trial," and that the government had not met its burden to show otherwise.   *Id.*   As with the

32

defendant in *Hitselberger*, Ms. Bell is charged with an offense that amounts to undermining U.S. defense and foreign policy concerns.   Unlike the defendant in that case, she has no considerable language skills and no demonstrated ability to live abroad.   Thus, *Hitselberger* strongly supports Ms. Bell's release on conditions.

*Hassanshahi* also serves as a useful comparison case.   There, the court affirmed a magistrate's grant of bond to a defendant charged with *conspiracy to unlawfully export technology to Iran and to defraud the United States.*   989 F. Supp. 2d at 118.   The government argued that the defendant presented a risk of flight because the nature of the charge was so serious; because he was alleged to have "undermine[d] the objectives of American foreign policy"; because he was a dual U.S.-Iranian citizen; because he had extended family in Iran who had recently hosted him on a trip there; because there was allegedly clear evidence of the defendant's untrustworthiness; because he faced a long time in prison; because certain statements the defendant had made indicated he identified more as Iranian than as American; because "electronic monitoring is not foolproof"; and because the defendant "could overcome several significant obstacles to get to Iran."   *See id.* at 111-18.   The court nevertheless found conditions of release could reasonably assure the defendant's appearance, noting that (1) the underlying crime did not fall within any of the particularly serious categories of offenses "set forth in section 3142(g)(1)"; (2) in other cases alleging violation of economic sanctions, "judges in th[e] District ha[d] authorized pretrial release under electronic monitoring for defendants whose

incentives to flee were substantially greater than those of [the defendant]"; (3) "[t]he facts of th[e] case [did] not suggest that [the defendant] engaged in any violence, or threats of violence, in the course of his transactions"; (4) the defendant had no immediate family members in Iran; (5) both of the defendant's passports had been confiscated; (6) the defendant "would first have to cross into Canada or Mexico to reach an Iranian embassy and obtain a new passport"; (7) "[n]ot every defendant convicted of violating economic sanctions laws is sentenced to a long term of incarceration"; and (8) the defendant's "immediate family ties to the United States provide[d] a strong countervailing disincentive to flee," as such an action "would likely render [the defendant] unable ever to return to the United States, causing him to miss important family events and milestones." *Id.*   Like *Hassanshahi*, the instant case does not involve a crime that falls within one of the particularly serious categories of offenses set forth by Congress in § 3142(g)(1); nor does the evidence show Ms. Bell has ever engaged in violence or threats of violence; nor does Ms. Bell still have a passport in her possession; nor would she be able to obtain a passport without taking extraordinary, difficult-to-imagine measures; nor does Ms. Bell necessarily face a long prison sentence.   Also as in *Hassanshahi*, Ms. Bell's strong immediate family ties in New Jersey "provide a strong countervailing disincentive to flee."   Meanwhile, in contrast to *Hassanshahi*, Ms. Bell has no family abroad who might board her—not immediate family, not extended family, nobody. Moreover, Ms. Bell is not a dual citizen with a country that the U.S. has strained

relations with.   Thus, *Hassanshahi* strongly supports a finding that there are conditions of release which can reasonably assure Ms. Bell's appearance in Court. Because Ms. Bell's risk of flight is highly speculative, and because the conditions the defense has proposed are robust—again, Ms. Bell's sons and partner would be ruined if she fled—the Bail Reform Act mandates release.

With regard to Ms. Bell's purported dangerousness, the defense has submitted a highly restrictive set of conditions to address the concern that Ms. Bell, in 2021, will resume providing material support to HTS as she allegedly did back in 2018.   The defense respectfully submits that these conditions are more than sufficient to reasonably assure the safety of the community while Ms. Bell is presumed innocent.   These conditions include (1) a strict limitation on the number of internet-capable electronics in Ms. Bell's home; (2) zero ability for Ms. Bell to access the devices on her own, only with the entry of a randomly-generated password by her partner Hesham; (3) a total blackout of Ms. Bell's computer usage, except for when she has scheduled videocalls with or is in the physical presence of defense counsel; and (4) Pretrial Services' monitoring of the only device which Ms. Bell may use.   ECF No. 8, ¶ 10.   Given these stringent conditions, and given the absence of any allegation of illegal conduct in 2019 and 2020, and given Ms. Bell's sterling past, she simply does not "pose[] a *concrete, prospective* threat to public safety," and thus may not be detained on the basis of dangerousness.   *United States v. Munchel*, ___ F.3d ___, 2021 WL 1149196, at *4 (D.C. Cir. Mar. 26, 2021)

35

(emphasis added) (reversing district court's order of detention of a defendant charged with violently entering the Capitol while armed with dangerous weapons on January 6, 2021); *see also United States v. Salim*, 2018 WL 1138287, at *2 (N.D. Ohio Mar. 2, 2018) (releasing defendant charged with material support of terrorism on conditions, including computer restrictions); *United States v. Parmer*, ___ F. Supp. 3d ___, 2020 WL 2213467, at *3 (N.D. Cal. Apr. 14, 2020) ("[S]haring child pornography online is a serious offense, but the risk of further harm to society is mitigated by the restrictions on [the defendant's] internet use imposed by the Magistrate Judge.   This greatly reduces his likelihood of again engaging in the charged conduct while on release.").

Ms. Bell's personal history, combined with the presumption of innocence, has absolutely earned her the opportunity to show that she will comply with the Court's orders.   She should be released forthwith.

IV.   Conclusion

For the foregoing reasons, the Court should revoke the Magistrate Judge's Order of Detention and order Ms. Bell released on the highly restrictive conditions proposed by the defense.   *See* ECF No. 8, ¶ 10.

Respectfully submitted,

MARIA SUE BELL
By Counsel

/s/ Rahul Sharma, AFPD
Office of the Federal Public Defender
1002 Broad Street
Newark, NJ 07302
(973) 320-7350
Rahul_Sharma@fd.org